IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

NADIYA WILLIAMS-BOLDWARE, §
§
    *Plaintiff,* §
§    CIVIL ACTION No. 4-09-cv-591
v. §
§
DENTON COUNTY, TEXAS et. al., §    JUDGE RON CLARK
§
    *Defendants.* §
§

## MEMORANDUM ORDER Re: DENTON COUNTY'S MOTION FOR JMOL

Plaintiff Nadiya Williams-Boldware sued Defendant Denton County alleging that the
County allowed a racially hostile work environment to exist in violation of Title VII of the Civil
Rights Act of 1964. At trial, the jury found in favor of Ms. Boldware and awarded her damages
for past physical pain and suffering, past mental anguish, and future mental anguish. The
County moved for judgment as a matter of law ("JMOL") on the record at trial and re-asserted
the motion in subsequent briefing. [Doc. # 105, 106].

Plaintiff's claim is unusual in that it is grounded on a single major incident with two
subsequent events providing some supporting evidence. However, Defendant's lawyer and its
witnesses portrayed that initial incident as horrendous, horrible, sickening, and a firing offense.
Drawing all reasonable inferences in favor of Plaintiff, the court finds that the evidence
introduced at trial supports the jury's verdict on the issue of hostile work environment and on
damages for past mental anguish. The court finds that there is no legally sufficient evidentiary
basis to find that the hostile work environment proximately caused her physical pain and

suffering or to find that she would suffer from mental anguish in the future. Defendant's motion is granted in part and denied in part.

## I. BACKGROUND

Ms. Boldware is an African American woman, who works as an Assistant District Attorney in the Misdemeanor Trial Division of the Denton County Criminal District Attorney's Office. On April 2, 2009, Cary Piel, a Caucasian Assistant District Attorney in the Felony Division was working on a case involving a black defendant he was prosecuting for driving while intoxicated through an African American cemetery, damaging a number of grave markers. That defendant made racially insulting remarks to the white arresting officers, and the incident was captured on police video. Late in the afternoon after Mr. Piel had reviewed the video of the incident, he left his office and went to Ms. Boldware's office. The two had never worked together on a case. In the course of his conversation with Ms. Boldware, Mr. Piel told her that the incident made him "want to go home and put on his white pointy hat" and made him "understand why people hung people from trees". Ms. Boldware notified her immediate supervisor Michael Graves of the offending remarks who reported Mr. Piel's statements up the chain of command.

The next day, First Assistant District Attorney Jamie Beck and District Attorney Paul Johnson discussed the incident with Ms. Boldware, inquiring what she would like the County to do about the situation. Ms. Boldware indicated at the meeting that she would like to speak to Mr. Piel and did so sometime during the next few days. Ms. Boldware testified that she did not believe the sincerity of Mr. Piel's apology and told First Assistant District Attorney Beck that she wanted something to be done about the situation. The County ultimately required Piel to attend a two hour diversity training class, even though both District Attorney Johnson and First Assistant

District Attorney Beck testified vehemently that they believed Piel's comments justified his immediate termination.

Ms. Boldware testified that on April 3, 2009, the day after Mr. Piel's comments, John Rentz, another felony level prosecutor in the office and friend of Cary Piel, called her a "troublemaker".[1]  At some point within the next few months, at Ms. Boldware's request, District Attorney Johnson transferred her to a new division supervisor, Allison Sartin in the Child Protective Services Division (CPS).  Johnson also assigned Ms. Boldware to a new office to limit her contact with Cary Piel's wife Susan, Plaintiff's former division supervisor.

On July 16, 2009, Cary Piel, who was in the area of Boldware's new office, said he needed a "boombox" to play a cassette tape in preparation for a trial.  Immediately thereafter, Piel stated, "oh I better watch what I say or else I'll have to take another one of those classes."  In response, Ms. Boldware delivered a memo to District Attorney Johnson and Human Resources setting out overview of Rentz's and Piel's comments.  After consulting with District Attorney Johnson and First Assistant District Attorney Beck, Amy Phillips, Director of Human Resources, issued a report, recommending that Rentz take a similar diversity training class but stating no further action needed to be taken against Piel.  On August 27, 2009, First Assistant District Attorney Beck informed Ms. Boldware of the decision.

---

[1]The parties dispute the factual context of Rentz's comments.  Ms. Boldware testified that Rentz walked directly by her office and twice directed the name at her.  When she confronted Rentz about what he meant by the term, he refused to respond.  Rentz, on the other hand, testified that he jokingly used the term in reference to his secretary and was unaware that Ms. Boldware was even in the vicinity.  No other witnesses testified about the issues, which the jury could have reasonably decided in Ms. Boldware's favor.  This presented a classic credibility determination.

Ms. Boldware brought suit against Denton County, alleging that the County allowed a racially hostile work environment to exist in violation of Title VII.  Ms. Boldware was still an employee with the County at the time of filing suit and at the time of trial.  It is undisputed that at no point did the County threaten to terminate Ms. Boldware for complaining of the purported racism or for filing suit.

After a three day trial, the jury returned a verdict, answering "yes" to the following questions:

1. Was Plaintiff harassed because of her race?

2. Was the harassment so sufficiently severe or pervasive as to affect a term, condition, or privilege of Plaintiff's employment?

3. Did Defendant know, or in the exercise of reasonable care should Defendant have known, that Plaintiff was being harassed because of her race?

4. Did Defendant fail to take prompt remedial action?

In response to question five, the jury awarded Plaintiff the following damages:

A.      Past mental pain, humiliation, embarrassment, depression, anger, emotional distress and damage to reputation:  $170,000

B.      Past physical pain and suffering:  $170,000

C.      Future mental pain, humiliation, embarrassment, depression, anger, emotional distress and damage to reputation: $170,000

[Doc. # 97, 98][2].

_____

[2]42 U.S.C. § 1981a(b)(3) limits the amount of non-pecuniary compensatory damages available to a successful Title VII claimant.  Defendant never raised this issue.  There was testimony that the County employed some 1,600 employees.  In light of the court's rulings on past physical pain and suffering and future damages, the judgment will be within the $300,000 cap.

4

## II. JMOL STANDARD OF REVIEW

Judgment as a matter of law ("JMOL") is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ".  Fed. R. Civ. P. 50(a)(1); s*ee also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S. Ct. 2097, 2109 (2000). There is no legally sufficient evidentiary basis where "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (internal quotations omitted).

A jury's verdict is given great weight and all reasonable inferences are drawn in the light most favorable to the verdict. *Thomas v. Tex. Dep't of Crim. Justice*, 220 F.3d 389, 392 (5th Cir. 2000); *see also Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 258 (5th Cir. 1999) ("We accord great deference to a jury's finding of facts."). In entertaining a motion for judgment as a matter of law, the court must review all of the evidence in the record. *Reeves,* 530 U.S. at 150, 120 S. Ct. at 2110. In doing so, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.*

# III. DISCUSSION

## A. Hostile Work Environment

To establish a claim of hostile work environment under Title VII, a plaintiff must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001). There is no dispute that Ms. Boldware is a member of a protected class and that on April 2, 2009, she was subjected to unwelcome harassment by Cary Piel based on her race.

The County moves to set aside the jury verdict, asserting that the April 2 incident was not sufficiently severe or pervasive so as to affect a term, condition or privilege of Ms. Boldware's employment. The County argues that the April 3 and July 16 incidents were not directed to Ms. Boldware and were not racially harassing statements as a matter of law. Alternatively, the County argues that, even if the April 2 incident was sufficiently severe, it took prompt remedial action to combat the alleged racial harassment.

## 1. Harassment

For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). Not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person

would find it to be hostile or abusive. *Id.* Workplace conduct is not measured in isolation. To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges that can survive summary judgment" *Lee v. Reg'l Nutrition Assistance, Inc.*, 2012 WL 1994474 at *1 (5th Cir. Jun. 1, 2012).

At first blush, this case appears to be similar to many that have been disposed of on summary judgment. *See, e.g. Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347-48 (5th Cir. 2007). However, Denton County did not file such a motion so the case was submitted to a jury. This means that the Court must draw all inferences in favor of Ms. Boldware and may not make the credibility determinations urged by Defendant in its motion.

**a. Evaluating the severity of the harassment**

Although the court has not found a Fifth Circuit case where one isolated incident provided the basis for a successful Title VII claim, the Circuit Court has expressly stated that "under the totality of the circumstance test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim." *EEOC v. WC&M Enters., Inc*., 496 F.3d 393, 400 (5th Cir. 2007) (citing *El-Hakem v. BJY Inc.,* 415 F.3d 1068, 1073 (9th Cir.2005) ( "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.").

The Fifth Circuit also has not specifically addressed the issue of whether harassment is sufficiently severe or pervasive as to affect a term, condition, or privilege of employment is categorized as a question of fact or a question of law. In a special concurrence Judge Wiener expressed his belief that whether comments alone can rise to the level of actionable harassment is a mixed question of law and fact. *Indest v. Freeman Decorating, Inc.*, 168 F.3d 795, 803 (5th Cir. 1999)(Wiener, concurring). At least three other circuits have held the issue is quintessentially a question of fact. *Hoyle v. Freightliner*, LLC 650 F.3d 321, 333 (4th Cir. 2011); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007); *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

Whether the issue is a question of fact or a mixed question of law and fact, the court must give due deference to the jury's verdict. *See e.g. United States v. Gaudin*, 515 U.S. 506, 512, 115 S. Ct. 2310, 2314 (1995)(mixed questions of law and fact have been typically resolved by juries); *see also Thomas*, 220 F.3d at 392("We accord great deference to the jury's verdict when evaluating the sufficiency of the evidence, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the verdict."); *Krystek*, 164 F.3d at 258("We accord great deference to a jury's finding of facts").

**b. Defendant admitted that April 2 incident was severe and warranted Piel's termination**

In an evident effort to win the jury's favor by showing empathy with, and sympathy for, Ms. Boldware, Defendant employed the strategy of repeatedly acknowledging the severity of Piel's April 2 remarks. In his opening statement, in questions to witnesses, and in closing argument, counsel for Defendant referred to Piel's "pointy hat" and "hanging people from trees" statements in terms such as as"racially inappropriate", "racially offensive", "horrible",

"horrendous", or "totally inappropriate" no fewer than twenty-eight times[3]. Each of the County's

employees agreed with one or more of these descriptions or testified in similar terms. District

Attorney Johnson testified that the remarks were so "offensive" and "unbelievable" that he

himself was "sickened" and "in shock" upon hearing the comments. Both District Attorney

Johnson and First Assistant District Attorney Jamie Beck, who ran the office's day to day

operations, testified that they believed the remarks were so offensive that they warranted Piel's

immediate termination. Plaintiff's current division supervisor, Allison Sartin, a veteran trial

attorney of thirty years' experience, actually cried on the stand while describing Piel's remarks.

Defendant gambled that this approach would convince jurors that neither the County, nor

the District Attorney tolerated racism, which would lead to a favorable jury verdict. Defendant

now moves for JMOL on the grounds that Piel's remarks were not so severe or pervasive as to

affect a term, condition, or privilege of Ms. Boldware's employment. A party should not be

heard to complain when a carefully chosen weapon backfires.

The court must resist the temptation to consider the remarks in light of the workplace

environment that may have existed a decade or more ago when the judge practiced law. The jury

was instructed to consider the evidence from the perspective of a reasonable person's reaction to

a similar environment under similar circumstances, and not from the perspective of an overly

sensitive person. [Doc. # 95 at 7-8]. The jury listened to Ms. Boldware for almost five hours. It

was entitled to believe her, and to accept the Defendant's witnesses and defense counsel's

characterization of the "pointy white hat" and "hanging people from trees" remarks as

horrendous, horrible, shocking sickening, and constituting grounds for Piel's immediate

---

[3]*See* Appendix A

termination. Considering Defendant's repeated admissions of the severity of the comments at trial, Defendant's new depiction of the remarks in its motion is unavailing.

There is also some evidence from which the jury could find that the racially hostile work environment was not created by Piel alone. A reasonable jury, after making a credibility determination, between two witnesses—Boldware and Rentz—could have believed Plaintiff's assertion that Rentz twice directed his troublemaker comments directly at her. Defendant is correct that there is no direct evidence in the record that proves Rentz knew of Piel's April 2 remarks when he called Plaintiff a troublemaker. However, the jury was entitled to make this inference based on the close relationship between Piel and Rentz and all the other circumstances. If the jury believed Ms. Boldware's description of the incident, which it was entitled to do, there was no evidence of any other reason for Rentz to call Plaintiff a "troublemaker". *See Denton v. Morgan*, 136 F.3d 1038, 1044 (5th Cir. 1998)("A jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict"). Even though the term "troublemaker" is not in and of itself a racially derogatory term, a reasonable jury could have concluded that, based on the context, the term was directly connected to, and supportive of, Piel's remarks and attitude.

The July 16 "boombox incident," which is discussed in more detail below, is also supporting evidence of a continuing hostile work environment, depending on which witness the jury believed. Viewing the evidence in the light most favorable to the Plaintiff, this Court concludes that Cary Piel's April 2, 2009 racially charged remarks, especially if viewed in conjunction with the Rentz comment and the "boombox incident", could form the basis for a jury

verdict that the harassment was sufficiently severe as to affect a term, condition, or privilege of Ms. Boldware's employment.

**2. Was a two hour sensitivity class reasonably calculated to end the harassment?**

An employer may avoid Title VII liability where, once informed of the allegations of harassment, the employer takes "prompt remedial action" to protect the plaintiff. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004). "Prompt remedial action" is an employer's response which is "reasonably calculated to end the harassment." *Id.* The promptness and adequacy of an employer's response to a complaint of harassment are fact questions for the jury to resolve. *Id.; Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989).

What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. *Waltman*, 875 F.2d at 479. Not every response by an employer will be sufficient to discharge its legal duty. *Hockman*, 407 F.3d at 329. An employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment. *Id.*

Denton County's initial response to Plaintiff's allegations of racial harassment was swift. Cary Piel made the offending remarks on the afternoon of April 2, 2009 and, by the next day the District Attorney and First Assistant District Attorney approached Plaintiff to discuss the situation. The question for the jury, however, was whether, under the circumstances, a mere two hour diversity training class was reasonably calculated to correct what the District Attorney and the First Assistant District Attorney concluded was a firing offense.

Virtually every lawyer in the chain of command, including District Attorney Johnson, First Assistant District Attorney Beck, and Division Supervisor Allison Sartin described Piel as an "arrogant", "abrasive", "egotistical", or "obnoxious" man who is often very cavalier with his words, was rude to his superior, Ms. Beck, on occasion, and had even once encouraged insubordination among prosecutors in Ms. Sartin's division. First Assistant District Attorney Beck and former Assistant District Attorney Tom Whitlock testified that they were surprised Piel apologized to Ms. Boldware, as he rarely admits any wrongdoing. Both District Attorney Johnson and First Assistant Attorney Beck testified that Piel's "pointy white hat" and "hanging people from trees" comments were "offensive" and "unbelievable" and that they were so "shocked" that they considered terminating Piel simply based on this single incident.

A reasonable jury could have accepted all of this testimony from Defendant's own supervisory employees and concluded that a single two hour diversity class, without so much as a brief suspension or even a written reprimand, was not reasonably calculated to give Mr. Piel pause, let alone to stop the racial harassment from recurring. A reasonable jury could have concluded that an experienced attorney like Mr. Piel recognized the ramifications of his remarks and therefore calmly sat through a two hour class, pretending to understand the hurtful nature of his comments. A reasonable jury could also have found that the July 16 incident showed that the remedial action taken was ineffective.

Courts must consider the effectiveness of any initial remedial steps taken by the employer in assessing whether the employer's response was remedial under the circumstances. *Houston v. EBI Cos*., No. 94-10968, 1995 WL 295897 *at 2 (5th Cir. Apr. 21, 1995). The July 16

comments by Cary Piel— which transpired after Piel attended his two hour class, are a basis for a reasonable jury determining that the two hour class was not effective.

After consulting with various dictionaries, including those that specialize in slang, the court is of the opinion that Cary Piel's mere use of the term "boombox" does not have racially harassing connotations per se. *See e.g.* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, 131 (10th ed. 2002)(defining a boombox as "a large portable radio and often tape player with two attached speakers"); *see also* The Racial Slur Database http://www.rsdb.org/search?q=boombox (Last visited July 31, 2012)("boombox" is not included as a racial slur). Immediately after referring to his need for a boom box, however, Piel stated "oh I better watch what I say or else I'll have to take another one of those classes." Depending on the context, inflection, and tone of Piel's voice, the jury did not have to believe that the comment was as benign as Defendant now asserts. *See Ash v. Tyson Foods Inc.*,546 U.S. 454, 456, 126 S. Ct 1195, 1197 (2006); *See also E.E.O.C. v. WC & M Enters., Inc.*, 496 F.3d 393 (5th Cir. 2007)(determining that a factfinder could reasonably conclude a co-worker's frequent banging on the glass partition of plaintiff's office was motivated by animus related to the plaintiff's national origin because that same coworker had constantly called the plaintiff "Arab" for approximately a year).

Again, there were two versions of the facts—Cary Piel's and Ms. Boldware's. A co-worker texted an apology to Ms. Boldware after the incident. While not conclusive, it is a factor a reasonable jury could have considered in deciding that Ms. Boldware was more credible and that Cary Piel attempted to minimize the tone and content of the statements. A reasonable jury could conclude that Piel joking about his diversity training indicates that the two hour class was more of a gentle slap on the wrist than an effective remedy.

## B. Compensatory Damages

As a prevailing plaintiff, Ms. Boldware may recover compensatory damages on her hostile work environment claim. Compensatory damages include damages for nonpecuniary losses such as emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life. *Langraf v. USI Film Prod.*, 511 U.S. 244, 253, 114 S. Ct. 1483, 1491 (1994)(citing 42 U.S.C. § 1981a(b)(3)). Defendant asserts that the amounts awarded by the jury for past mental anguish, past physical harm and suffering, and future mental anguish are clearly erroneous in light of the evidence presented at trial. [Doc. # 106].

### 1. Damages for Past Mental Anguish

Courts must review damage awards based on intangible harm with deference because "the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001). Nonetheless, to recover more than nominal damages for emotional distress, a plaintiff must provide proof that an "actual injury" resulted from the harassment. *Flowers v. S. Reg'l Servs. Inc.*, 247 F.3d 229, 238-39 (5th Cir. 2001). To demonstrate an "actual injury", a plaintiff must introduce specific evidence regarding the "existence, nature, and severity of [the] emotional harm." *Id.* Hurt feelings, anger and frustration are part of life—the evidence must show a discernible injury to the plaintiff's emotional state. *Giles*, 245 F.3d at 488. A Plaintiff's vague allegations will not establish the existence of an injury. *Id.*

Compensable emotional distress "may manifest itself . . . as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, or a nervous breakdown." *WC&M Enters., Inc.*, 496 F.3d at 402 (quoting EEOC Policy Guide

14

No. 915.002 § II(A)(2), at 10-12 (July 14, 1992)).  Physical symptoms of emotional distress include ulcers, gastrointestinal disorders, hair loss, or headaches.  *Id.*  Provided the record contains specific evidence of emotional distress, a plaintiff's testimony, without more, may support such an award.  *Id.*; *See also Williams v. Trader Publishing Co.*, 218 F.3d 481, 486 (5th Cir. 20000)(Title VII plaintiff's testimony that her employment discharge resulted in sleep loss, smoking and weight loss sufficient to support an award of $100,000 in compensatory damages for pain and suffering).

Ms. Boldware's testimony reflects that, as a result of the hostile work environment she had difficulty sleeping, struggled with anxiety, and the hostile work environment caused problems with her family life.  Ms. Boldware also testified that during this time she suffered hair loss and shingles.  Allison Sartin and First Assistant District Attorney Jamie Beck corroborated Ms. Boldware's emotional distress.  *See Brady v. Fort Bend County*, 145 F.3d 691 719 (5th Cir. 1998)(corroborating testimony from a spouse, family member, friend or coworker, regarding objective evidence of emotional distress, such as crying spells, outbursts of anger, sleeplessness, or excessive sleeping support an award of emotional distress).  Specifically, Ms. Sartin testified that Ms. Boldware was "extremely upset" and that "it's unusual to see someone that upset really anywhere."  Ms. Beck testified that Ms. Boldware was "literally sobbing" in her office , which Beck believed was a genuine response.  Ms. Beck further testified that Ms. Boldware was upset when she met with Beck and Johnson because she never wanted things to go "this far" as to involve the District Attorney and First Assistant District Attorney.  Ms. Boldware's testimony combined with the testimony from corroborating witnesses was sufficiently specific to support the jury's determination of past mental anguish damages.

**2. Damages for Physical Harm**

       Plaintiff testified at trial that stress from her racially charged work environment

manifested itself into several physical ailments such as hair loss and shingles.  She requested a

separate question on the issue to which Defendant objected.  The court pointed out its concern

with the evidence and the lack of authority for damages based on physical harm.  However, since

this was a novel issue, the court submitted the issue so the jury finding would be available, in the

event a reviewing court determined that physical damages would be allowed in this case.

       Ms. Boldware's uncontradicted testimony of hair loss and shingles tends to support

emotional harm damages, physical pain and suffering.  *See WC&M Enters., Inc.*, 496 F.3d at 402.

However, no medical expert testified as to the causal connection between these physical

symptoms and her hostile work environment.  *See Folwer v. Carrollton Pub. Library*, 799 F.2d

976, 983 (5th Cir. 1986). Hair loss and shingles can be evidence of stress.  But to recover for

physical injuries, it is a plaintiff's burden to prove that the harassment proximately caused a

physical condition.  *Hamilton v. Rodgers*, 791 F.2d 439, 444; n.3 (5th Cir. 1990)("the most any

witness . . . could properly say is that the racial incidents could have been a factor in the

development of [Plaintiff's] physical problems") *abrogated on other grounds by Harvey v.

Blake*, 913 F.2d 226, 228 n. 2 (5th Cir. 1990).[4]  While cases recognize that a plaintiff can prove

emotional harm without supporting medical testimony[5], there is no authority for allowing an

---

     [4]*Harvey v. Blake*, 913 F.2d 226, 228 n. 2 (5th Cir. 1990) abrogated *Hamilton v. Rodgers*,
791 F.2d 439, 444 (5th Cir. 1990) to the extent it held that public officials may be liable for back
pay under Title VII in their unofficial as opposed to official capacity.

     [5]*See e.g., Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 470 (5th Cir. 2001); *Vaughn v.
Sabine Cnty.*, 104 Fed App'x 980, 987,  2004 WL 1683099 at * 5 (5th Cir. 2004).

additional separate recovery for physical harm on a Title VII harassment case without proof of causation.

One could imagine a case where the harassment included raising a 100+ decibel horn to the plaintiff's ear, resulting in a hearing loss, or exposing a known epileptic to a strobe light resulting in a seizure.  Here, there is no evidence of such an obvious  physically traumatic event that would permit a jury, without expert testimony, to distinguish between the hair loss and shingles as a manifestation of mental anguish, and as a separate physical injury.  Accordingly, the court grants judgment as a matter of law in favor of Defendant on Plaintiff's award for past physical pain and suffering .

## 3. Damages for Future Mental Anguish

A prevailing plaintiff in a Title VII case may recover damages for future emotional distress where there is  testimony in the record that could enable the jury to reasonably determine that a plaintiff would suffer from mental anguish in the future.  *See, e.g., Vaughn v. Sabine Cnty.*, 104 Fed App'x 980, 987,  2004 WL 1683099 at * 5 (5th Cir. July 28, 2004)(affirming a jury's award for future mental anguish where Plaintiffs described their ongoing loss of standing in the community)*; O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1257 (10th Cir. 2001)(affirming a jury's award for future mental anguish where Plaintiff testified concerning his inability to sleep and his loss of appetite which continued *during* trial and was corroborated by plaintiff's wife's statements that his condition had deteriorated in recent months);

The Fifth Circuit has affirmed a jury's award for future mental anguish where the plaintiff was terminated, and reinstatement was not a viable option.  *See Vaughn*,104 Fed. App'x at 981-

82 (5th Cir. 2004); *see also Chollett v. Patterson-UTI Drilling Servs., Lp, LLLP*, No. V-08-27, 2010 WL 3700833 (S.D. Tex. Sept. 14, 2010)(evidence that plaintiff was unlikely to find a job in the oilfield, an occupation he loved, because animosity meant that reinstatement was not possible, and plaintiff's *ongoing* sleep problems were sufficient to support the jury's award of $50,000 for future mental anguish).

The Fifth Circuit specifically considered a jury's award of $100,000 for future emotional damages in *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361 (5th Cir. 2002). After reviewing the testimony supporting an award of future mental anguish damages, the Court decided to reduce the award, reasoning that based on the plaintiff's insubstantial injuries, at most the jury could have properly awarded plaintiff $50,000 for future mental anguish. In evaluating the jury's award for future damages, the Court in *Thomas* expressed its concern that the jury had awarded more than three times the amount of the past damages, despite the evidence which indicated that the plaintiff's emotional difficulties had subsided. *Id.* at 370–71.

Specifically, the plaintiff in *Thomas* testified that "she currently enjoys her job" and that "[a]lthough she has given up hope of future promotions, she still derives great pleasure from helping others at work." *Id.* at 371. The *Thomas* plaintiff "admitted that she has received favorable evaluations; she has been named employee of the month. She has continued to pursue her degree at Sam Houston University, where she originally began taking classes to further her career ambitions." *Id.* While the "evidence pointed to some ongoing and future emotional distress, ... [it was] nothing as severe as what [plaintiff] suffered during the retaliatory period." *Id.*

Ms. Boldware clearly testified to past severe emotional distress. However, unlike *O'Neal*, where the Plaintiff and wife's testimony indicated that his condition had deteriorated in recent months or *Chollette* where there was evidence that Plaintiff's sleeping problems were ongoing, there was no testimony as to any ongoing deterioration of Ms. Boldware's mental state. Rather, this case is more like *Thomas* with evidence indicating that by the time of trial, Ms. Boldware's emotional difficulties had subsided. The County had assigned Ms. Boldware to a new division supervisor, Allison Sartin. Ms. Sartin testified that the work place environment is congenial. Ms. Sartin testified that she treats her CPS employees as a family, and all the employees in the division are friendly with each other. Ms. Boldware corroborated Ms. Sartin's testimony regarding the friendly environment when she testified that co-workers in the misdemeanor division threw a birthday party for her in October 2009 and a baby shower for her in December 2009.

It is uncontested that Ms. Boldware was never told she would be fired; she did not believe her termination may ensue. Unlike the *Thomas* plaintiff, Ms. Boldware has been promoted. Ms. Sartin testified as to the quality of Ms. Boldware's work, observing that Ms. Boldware is a satisfactory employee and a diligent worker. Ms. Boldware nevertheless testified that she worried about her future and was unsure whether she would want to return to her position after a verdict was rendered, and she had removed her personal possessions from her office right before trial. However, Ms. Boldware admitted on cross examination that any worry about the future was her "self-generated worry about how [she] was going to be able to function in the environment." Trial Tr. June 20, 2012,44:2-5 [Doc. # 107]. That is worry about what may happen based on possible future events, not a holdover effect from the Piel incident.

19

Unlike the Plaintiff in *Chollett,* where the evidence indicated it was unlikely the Plaintiff would find a job in the oilfield, an occupation he loved, there is no evidence that Ms. Boldware could not find a similar position in the legal profession.  There was no evidence that she was rejected from jobs to which she had applied.  Rather, Ms. Boldware was concerned about having to disclose this civil lawsuit on her future job applications. Concern over filing a lawsuit as a young attorney is not evidence of ongoing humiliation sufficient to be awarded damages for future mental anguish.  Unlike the Plaintiffs in *Vaughn* who suffered loss of standing in the community by working  minimum wage jobs to provide for their families, Ms. Boldware suffered no such injury.

There is insufficient evidence to support a jury finding that Ms. Boldware would suffer from emotional distress in the future, much less that her future mental anguish would be equivalent to her past mental anguish.  While it is a close call, and the evidence and verdict are available for review, the court concludes that  the future damages case is even weaker than that in *Thomas*, so that a partial reduction is not appropriate.  Accordingly, the court grants Defendant's motion for judgment as a matter of law as to Plaintiff's award of $170,000 in future mental anguish damages.

## IV. CONCLUSION

 Drawing all reasonable inferences in favor of Plaintiff, the court finds that the evidence introduced at trial supports Ms. Boldware's claim of hostile work environment, and the jury verdict for past mental anguish damages. The court grants judgment as a matter of law in favor of

Defendant on Ms. Boldware's awards for physical pain and suffering and future mental anguish.

Plaintiff's request for attorneys fees will be the subject of a separate order and final judgment will be entered pursuant to Fed. R. Civ. P. 58.

So **ORDERED** and **SIGNED** this **10** day of **August, 2012.**

_____

Ron Clark, United States District Judge

Appendix A: Counsel and key County employees' description of Cary Piel's remarks

**Defense Counsel**

| Description in argument or questioning | Number of Times Used |
|---|---|
| Racially, horribly, and/or totally inappropriate | 12 |
| Racially insensitive | 1 |
| Racially Offensive | 4 |
| Horrible | 4 |
| Shocked | 3 |
| Horrendous | 1 |
| Not right | 1 |
| Not proper | 1 |
| Not acceptable | 1 |

**District Attorney Johnson**

| Description in answer to questions | Number of Times Used |
|---|---|
| Sickened | 1 |
| Offensive | 2 |
| In shock | 1 |
| Unbelievable | 1 |
| (absolutely) horrible | 2 |
| Cary Piel's remarks justified immediate termination | 14 |

**First Assistant District Attorney Beck**

| Description in answer to questions | Number of Times Used |
|---|---|
| Shocked | 1 |
| Cary Piel's remarks justified immediate termination | 2 |